IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

YVONNETTE DENISE ROSS,　　　　)
　　　Plaintiff,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　　)　　　Civil No. 3:18-cv-42 (HEH)
　　　　　　　　　　　　　　　　　　)
NANCY A. BERRYHILL,　　　　　　)
Acting Commissioner of Social Security,　)
　　　Defendant.　　　　　　　　　　)
_____)

## REPORT AND RECOMMENDATION

On October 29, 2013, Yvonnette Denise Ross ("Plaintiff") protectively applied for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the

Social Security Act ("Act"), alleging disability from diabetes, neuropathy, high blood pressure

and high cholesterol, with an alleged onset date of March 31, 2013.  The Social Security

Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration.

Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision

and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as

the final decision of the Commissioner ("Defendant").

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by:  (1) incorrectly affording limited weight to the opinions of

Plaintiff's treating physicians; and, (2) posing hypotheticals to the vocational expert ("VE") that

did not properly embody Plaintiff's residual functional capacity ("RFC").  (Pl.'s Mem. Supp.

Mot. Summ. J. & Mot. to Rem. ("Pl.'s Mem.") (ECF No. 15) at 8-13.)  This matter now comes

before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the

parties' cross-motions for summary judgment, rendering the matter ripe for review.[1]  For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) and Motion to Remand (ECF No. 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

I.   PROCEDURAL HISTORY

On October 29, 2013, Plaintiff filed applications for SSI and DIB, alleging disability from diabetes, neuropathy, high blood pressure and high cholesterol, with an alleged onset date of March 13, 2013.  (R. at 17, 52-53, 170-72, 991-1000.)  The SSA denied Plaintiff's application for SSI on November 15, 2013, because Plaintiff earned too much from unemployment benefits to be eligible.  (R. at 73.)  The SSA further denied Plaintiff's applications for both SSI and DIB on September 5, 2014, finding that Plaintiff did not qualify as disabled.  (R. at 83-87, 102.)  After Plaintiff requested reconsideration, the SSA again denied her application for DIB on May 19, 2015.  (R. at 53-69, 96-98.)  The SSA reconsidered and denied Plaintiff's application for SSI on October 6, 2015, after her income decreased.  (R. at 93.)  At Plaintiff's written request, the ALJ held a hearing on December 8, 2016.  (R. at 103, 1010-51.)  On March 21, 2017, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because she could perform jobs existing in significant numbers in the national economy.  (R. at 17-29.)  On December 4, 2017, the Appeals Council denied Plaintiff's

---

[1]     The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 7-13.)

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the

3

findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III.   THE ALJ'S DECISION

On December 8, 2016, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 1010-51.) On March 21, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 17-31.)

4

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 19-29.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 31, 2013, Plaintiff's alleged onset date. (R. at 19.) At step two, the ALJ determined that Plaintiff had the following severe impairments: essential hypertension, diabetes mellitus, peripheral neuropathy,[2] diabetic retinopathy,[3] keratoconus,[4] bilateral metatarsalgia,[5] bilateral plantar fasciitis[6] and bilateral heel spurs.[7] (R. at 19.) At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (R. at 21.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with additional limitations. (R. at 22.) Plaintiff could occasionally balance, stoop, kneel, crouch or climb ramps or stairs, but could

---

[2]     Patients with peripheral neuropathy experience a functional disturbance or pathological change in two or more of their peripheral nerves, affecting their ability to touch or feel. *Neuropathy*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[3]     Diabetic retinopathy describes a range of degenerative conditions in the retina brought on by diabetes mellitus, including microaneurysms, punctate hemorrhages and cotton-wool spots. *Retinopathy*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[4]     Patients with keratoconus experience "noninflammatory, usually bilateral protrusion of the cornea." *Keratoconus*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[5]     Metatarsalgia denotes pain in the metatarsal bones, which are in the feet. *Metatarsalgia*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[6]     Plantar fasciitis refers to inflammation and tearing of the plantar fascia, a tissue located in the heel. *Fasciitis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[7]     A heel spur describes an abnormal bony protrusion in the heel. *Spur*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

never crawl or climb ladders, ropes or scaffolds. (R. at 22.) The ALJ further found that Plaintiff

had to avoid all exposure to hazards. (R. at 22.) Plaintiff could frequently handle and finger

bilaterally and required a cane to ambulate as needed. (R. at 22.) Finally, the ALJ found that

Plaintiff could lift and carry up to ten pounds and walk for two hours and sit for six hours in an

eight-hour workday. (R. at 27.)

At step four, the ALJ determined that Plaintiff could not perform any of her past relevant

work. (R. at 27.) However, at step five, the ALJ found that Plaintiff's age, education, work

experience and RFC allowed her to perform jobs existing in significant numbers in the national

economy, including work as an addresser, nut sorter and cuff folder. (R. at 28.) Therefore, the

ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 28-29.)

## IV.   ANALYSIS

Plaintiff, forty-six years old at the time of this Report and Recommendation, previously

worked as a retail associate and supervisor. (R. at 197-99.) She applied for DIB and SSI,

alleging disability from diabetes, neuropathy, high blood pressure and high cholesterol, with an

alleged onset date of March 31, 2013. (R. at 54-55, 170-72, 991-1000.) Plaintiff appeals to this

Court, contending that the ALJ erred by: (1) incorrectly affording limited weight to the opinions

of Plaintiff's treating physicians; and, (2) posing hypotheticals to the VE that did not properly

embody Plaintiff's RFC. (Pl.'s Mem. at 8-13.) For the reasons set forth below, the ALJ did not

err in her decision.

### A.    The ALJ Properly Assigned Limited Weight to Drs. Awadh's and Cashdollar's Opinions.

Plaintiff first argues that the ALJ erred in affording limited weight to the opinions of

Plaintiff's treating physicians, Abla Awadh, M.D., and Michael Cashdollar, D.P.M. (Pl.'s Mem.

at 8-11.) Specifically, Plaintiff contends that the ALJ failed to cite evidence from other treating

6

providers that contradicted Drs. Awadh's and Cashdollar's opinions and that the evidence of record in fact supports the doctors' opinions. (Pl.'s Mem. at 8-11.) Ultimately, Plaintiff alleges that the ALJ "'inappropriately substituted a subjective decision for that of the overwhelming medical evidence.'" (Pl.'s Mem. at 11 (quoting *Lewis v. Berryhill*, 858 F.3d 858, 868 (4th Cir. 2017).) Defendant responds that substantial evidence supports the ALJ's weighing of the opinion evidence, because Drs. Awadh's and Cashdollar's opinions proved inconsistent with Plaintiff's treatment record and reported daily activities. (Def.'s Mot. Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 16) at 12-15.)

During the sequential analysis, when the ALJ determines whether the claimant experiences a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927. When the record contains several medical opinions that are consistent with each other, the ALJ decides based on that evidence. §§ 404.1527(c), 416.927(c). If, however, the medical opinions are inconsistent with each other or with other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Under the regulations, an ALJ may consider only an "acceptable medical source" as a treating source that offers an opinion entitled to controlling weight. SSR 06-03p. Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a). A treating source's opinion must be given controlling weight if medically

acceptable clinical and laboratory diagnostic techniques support it, and it comports with other substantial evidence in the record.  §§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d at 867; *Craig*, 76 F.3d at 590; SSR 96-2p.[8]  Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, such as when the source opines on the issue of disability (an issue reserved for the Commissioner), or when the treating source's opinion proves inconsistent with other evidence or when other evidence in the record does not strongly support the opinion.  §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d). Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'"  *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).  Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded.  *Id.*

The ALJ must consider the following when evaluating a treating source's opinion:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors.  §§ 404.1527(c), 416.927(c).  However, those

---

[8]      Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-03p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f), 416.927(f).  82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017).  Plaintiff filed her claim on May 7, 2015, before this regulation took effect.  (R. at 359, 365.)  The Agency does not have the power to engage in retroactive rulemaking.  *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power).  Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule codified 20 C.F.R. §§ 404.1527, 416.927.

same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant qualifies as disabled as defined under the Act.  §§ 404.1527(d)(1), 416.927(d)(1).

Here, Plaintiff takes issue with the assignment of less than controlling weight to the opinions of two of her treating physicians, Drs. Awadh and Cashdollar.  For the reasons set forth below, the ALJ did not err.

Dr. Cashdollar completed a residual functional capacity questionnaire (the "Questionnaire") for Plaintiff on December 18, 2013.  (R. at 270-72.)  In the Questionnaire, Dr. Cashdollar noted pain, burning and numbness in Plaintiff's feet, which he believed often interfered with Plaintiff's ability to concentrate and to give attention to simple, work-related tasks.  (R. at 270.)  Dr. Cashdollar opined that Plaintiff could walk no more than one-and-a-half city blocks and could sit and stand no longer than ten to fifteen minutes at one time.  (R. at 270.)  Within an eight-hour workday, Dr. Cashdollar estimated that Plaintiff could sit for a total of three hours and stand or walk for a total of one hour.  (R. at 270.)  Dr. Cashdollar affirmed that Plaintiff would need unscheduled, fifteen-minute breaks approximately every one to two hours during a regular workday.  (R. at 270.)  Plaintiff could occasionally lift less than ten pounds, but never lift more.  (R. at 271.)  Dr. Cashdollar did not opine about Plaintiff's specific limitations in reaching, handling or fingering, as his specialty was in podiatry.  (R. at 271.)  In a given month, Dr. Cashdollar believed Plaintiff would miss three or four days of work as result of her impairments.  (R. at 271.)  Ultimately, Dr. Cashdollar concluded that Plaintiff could not work eight hours per day, five days per week on a sustained basis.  (R. at 271.)

Dr. Cashdollar assessed Plaintiff's functional limitations a second time on June 25, 2015. (R. at 654-56.)  In that assessment, Dr. Cashdollar again noted that Plaintiff could lift or carry no

more than ten pounds. (R. at 654.) He further reaffirmed that Plaintiff could stand or walk for no more than one hour and sit for no more than three hours in an eight-hour workday. (R. at 655.) Dr. Cashdollar opined that Plaintiff could never climb and could occasionally balance, stoop, crouch, kneel and crawl. (R. at 655.) Although Dr. Cashdollar stated that he believed that Plaintiff's impairments limited her ability to handle, feel, push and pull, he did not explain how Plaintiff's impairments affected those functions. (R. at 656.) Dr. Cashdollar also failed to explain how, as he asserted, Plaintiff's impairments limited her ability to move machinery. (R. at 656.) In a medical source statement accompanying his medical assessment of Plaintiff, Dr. Cashdollar opined that Plaintiff could walk no more than one city block, a half-block less than his 2013 assessment. (R. at 270, 658.) Dr. Cashdollar further restricted Plaintiff to sitting no longer than thirty minutes and standing no longer than fifteen minutes at one time. (R. at 658.) Contrary to his opinion in Plaintiff's medical assessment that Plaintiff could sit up to three hours in an eight-hour workday, Dr. Cashdollar's medical source statement specified that Plaintiff could sit no longer than two hours. (R. at 658.) And, although affirming that Plaintiff needed a job that allowed her to walk around, Dr. Cashdollar did not specify how often she had to walk or for how long. (R. at 658.) Dr. Cashdollar stated that Plaintiff would need breaks of up to fifteen minutes every two to three hours and elevated legs while sitting. (R. at 658.) Contradicting his medical assessment, Dr. Cashdollar recorded that Plaintiff could only rarely, not occasionally, stoop and crouch. (R. at 659.) Plaintiff could also have no exposure to environmental hazards. (R. at 659.) Ultimately, Dr. Cashdollar's concluded that Plaintiff would be off task twenty percent of the time in a typical workday and was capable of only low stress work. (R. at 660.)

Dr. Awadh completed a medical assessment of Plaintiff's ability to do work-related activities and a medical source statement on June 23, 2015. (R. at 607-14.) During Plaintiff's

assessment, Dr. Awadh opined that Plaintiff could frequently carry only ten pounds or less. (R. at 607.) Dr. Awadh also limited Plaintiff to standing or walking for only one hour and to sitting for only three hours in an eight-hour workday, citing Plaintiff's back pain and neuropathy as the causes of this limitation. (R. at 608.) If required to walk, Dr. Awadh believed that Plaintiff could walk no more than one city block. (R. at 612.) And Plaintiff could sit for no more than thirty minutes and stand for no more than fifteen minutes at one time. (R. at 612.) In her medical source statement, Dr. Awadh limited Plaintiff to both sitting and standing for less than two hours in an eight-hour workday, contradicting her medical assessment opinion that Plaintiff could sit for up to three hours. (R. at 608, 612.) Dr. Awadh also believed that Plaintiff would require at least fifteen-minute breaks every two to three hours, a cane to ambulate and elevation of her legs while sitting. (R. at 612-13.) By Dr. Awadh's estimation, Plaintiff could never climb and could only occasionally balance, stoop, crouch, kneel and crawl. (R. at 608.) However, Dr. Awadh later contradicted these limitations in her medical source statement, opining that Plaintiff could only rarely stoop and crouch. (R. at 613.) Dr. Awadh further opined that Plaintiff's impairments limited her capacity to handle, feel and push and pull, though Dr. Awadh did not explain how Plaintiff's impairments impacted those physical functions. (R. at 609.) Dr. Awadh remarked that Plaintiff's impairments limited her ability to move machinery and to handle exposure to environmental hazards, but again did not explain how Plaintiff's impairments caused those restrictions. (R. at 609, 613.) Ultimately, Dr. Awadh concluded that Plaintiff would be off task an average of twenty percent of the time during a workday and would be absent from work more than four days per month. (R. at 614.)

The ALJ assigned Drs. Awadh and Cashdollar's opinions limited weight, finding them inconsistent with Plaintiff's "grossly conservative and outpatient treatment history, the

11

documented clinical and examination findings of no acute musculoskeletal or neurologic complications to warrant such severe restrictions, and Ms. Ross'[s] testified ongoing daily capabilities." (R. at 27.)  The ALJ did not err in assigning limited weight.

### 1.     The ALJ Satisfied the Legal Requirement to Explain Her Reasoning.

Although Plaintiff alleges that the ALJ failed to cite any evidence from treating providers that contradicted Drs. Awadh's and Cashdollar's limitations, the undersigned finds that the ALJ properly explained her decision in accordance with the law.  Specifically, the law requires that the ALJ's assignment of weight be sufficiently specific "to make clear to any subsequent reviewers the weight the adjudicator gave to the . . . source's medical opinion and the reasons for that weight." SSR 96-2p (discussing affording weight to treating physician); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Strawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold v. Sec'y of Health Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)).

As mentioned, the ALJ stated that Drs. Awadh's and Cashdollar's opinions deserved limited weight, because they proved inconsistent with Plaintiff's conservative treatment history, treatment records and own subjective statements. (R. at 27.)  The ALJ discussed Plaintiff's treatment history and testimony before deciding to assign limited weight to the opinions of Drs. Awadh and Cashdollar. (R. at 23-26.)  The ALJ need not repeat herself by regurgitating Plaintiff's treatment record and testimony each time that she considers an opinion. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.").  Rather, the ALJ explained the record and Plaintiff's testimony in detail and further explained that the record and testimony provided grounds to

12

assign limited weight to Drs. Awadh and Cashdollar's opinions. Because the ALJ provided a sufficiently specific explanation for this Court to now review the ALJ's assignment of weight, the ALJ therefore did not err as a matter of law.

### 2. The Opinions Proved Inconsistent with Plaintiff's Conservative Treatment.

Substantial evidence also supports the ALJ's assignment of limited weight to Drs. Awadh's and Cashdollar's opinions. For one, as the ALJ noted, Plaintiff's medical records reveal a relatively conservative course of treatment that contradicts the extreme limitations that Drs. Awadh and Cashdollar endorsed. Under the regulations, an ALJ may consider the medications and treatments used to alleviate a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(v). If the claimant requires only conservative treatment, an ALJ is reasonable in holding that the alleged disability lacks the seriousness that the claimant alleges. *Dunn v. Colvin*, 607 F. App'x 264, 274-75 (4th Cir. 2015).

Plaintiff's medical records demonstrate that her symptoms responded well to conservative treatments. Notably, Plaintiff's podiatric problems improved under Dr. Cashdollar's own conservative treatment plan, which called for stretching two to three times daily, wearing supportive footwear and night splints, rest and ice as needed and taking Gabapentin. (R. at 465, 615-16.) Over the course of Plaintiff's treatment with him, Dr. Cashdollar frequently recorded steady improvement in Plaintiff's feet and noted Plaintiff's positive response to the conservative and outpatient treatment plan. (R. at 615-16, 622-23, 625, 636, 645, 648, 774, 777-78, 781-82, 783-84, 786-87, 789-90.) When Plaintiff complained that Dr. Cashdollar's treatments had not helped, Dr. Cashdollar simply adjusted Plaintiff's medications or otherwise instructed her to continue the same course of action. (R. at 619-20,

622-23.)  And Plaintiff's other podiatrists instructed her to follow the same plan, adjusting her dosages as needed.  (R. at 737-39, 743-45.)

Plaintiff's physicians likewise treated her peripheral neuropathy conservatively.  Dr. Awadh first diagnosed Plaintiff with neuropathy on December 12, 2013.  (R. at 301.)  In response, Dr. Awadh recommended outpatient physical and occupational therapy and energy conservation.  (R. at 296.)  Plaintiff's physical and occupational therapists reported that Plaintiff could act relatively independently, performing tasks with only minor modifications.  (R. at 304, 316-17, 332.)  On October 31, 2014, Sandra Crouse, M.D., reviewed an electromyogram test of Plaintiff's motor and sensory functions with Plaintiff, confirming that Plaintiff had neuropathy and prescribing her Lyrica to treat it.  (R. at 550-52.)  At no point did Plaintiff's physicians opine that her neuropathy required more than medicative and outpatient treatment.

When Plaintiff presented to physicians with back pain, her doctors again chose conservative treatments.  Plaintiff first sought treatment for her back on May 4, 2015, when she treated with Shaun Khosla, M.D., of Lake Ridge Orthopedic.  (R. at 847-50.)  During that appointment, Dr. Khosla instructed Plaintiff to pursue physical therapy.  (R. at 849-50.)  In July 2015, Plaintiff reported that physical therapy relieved her pain considerably.  (R. at 844.)  By October 2015, Plaintiff had stopped attending physical therapy due to insurance issues and Dr. Khosla recommended that she restart taking Tylenol with Codeine to treat any pain.  (R. at 840, 843.)  Dr. Khosla further prescribed Naproxen to Plaintiff on November 17, 2015.  (R. at 839.)  Plaintiff's second orthopedic doctor, Rommaan Ahmad, D.O., also treated Plaintiff's pain with prescription medications and physical therapy.  (R. at 823, 828, 833.)  In addition, Dr. Ahmad ordered epidural steroid injections, which Plaintiff received on July 25 and August 22, 2016.  (R. at 823, 851-52.)  Plaintiff responded well to the injections.  (R. at 813.)  Plaintiff also reaffirmed

that physical therapy relieved her back pain.  (R. at 806, 820, 840.)  At no point did Plaintiff's orthopedic doctors opine that Plaintiff required more extensive treatment.

Plaintiff's diabetes also responded well to relatively conservative treatment.  Plaintiff's first record of type II diabetes treatment is from 2012, when Dr. Awadh prescribed insulin to her and recommend a low-salt, low-sugar diet.  (R. at 489-90.)  Physicians continued to use insulin to treat Plaintiff when she presented to them with diabetic symptoms, such as dehydration.  (R. at 242, 246, 254.)  In March 2014, Plaintiff began treating with Yasser Ousman, M.D., a diabetes specialist.  (R. at 426.)  Dr. Ousman opined that Plaintiff's diabetes remained uncontrolled, but noted that her current medication regimen proved effective.  (R. at 428, 585.)  When Plaintiff complained of feeling hypoglycemic in June 2014, Dr. Ousman simply altered Plaintiff's medications, (R. at 580-82), and Plaintiff responded well to the new treatment, (R. at 577).  A second diabetes specialist, Mahdere Asfaw, M.D., reaffirmed that Plaintiff's blood glucose remained satisfactory when Plaintiff visited him in March 2015.  (R. at 573-74.)

Plaintiff's eye conditions did not require extensive treatment either.  Upon referral, Plaintiff first sought treatment for her retina problems in April 2014.  (R. at 473.)  During that appointment, Eric S. Lee, M.D., found that Plaintiff experienced moderate intra-retinal hemorrhages, but showed no signs of macular edema.  (R. at 473.)  Dr. Lee diagnosed Plaintiff with moderate, non-proliferative diabetic retinopathy and keratoconus, but noted that her condition remained stable and ordered a follow-up in six months.  (R. at 473.)  There is no record of any eye surgery or other treatment.

Undoubtedly, Plaintiff's treatment record proves inconsistent with Drs. Awadh's and Cashdollar's opinions that Plaintiff suffered severe limitations.  Although Plaintiff's impairments demanded regular treatment, such treatment remained relatively conservative, requiring mostly

outpatient physical therapy and medicative care.  Drs. Awadh and Cashdollar themselves instructed Plaintiff to follow conservative, outpatient treatment plans.  Importantly, the record demonstrates that Plaintiff responded well to conservative treatments, repeatedly reporting that physical therapy and medicative care improved her symptoms.  Given Plaintiff's conservative course of treatment, the ALJ could reasonably infer that Plaintiff's impairments were not as severe as either she or Drs. Awadh and Cashdollar endorsed.  *Dunn*, 607 F. App'x at 274-75.

### 3.     The Doctors' Opinions Lack Consistency with Plaintiff's Treatment Records.

Plaintiff's treatment records further undermine the opinions of Drs. Awadh and Cashdollar.  The longitudinal record resounds with evidence that Plaintiff could complete at least sedentary work.  Plaintiffs physicians observed normal bodily systems throughout her treatment. (R. at 241-42, 269, 363, 402-03, 419-20, 426, 489-90, 554, 571, 580, 583-84, 808, 822.) Plaintiff's physical examinations repeatedly revealed normal gait, speech, memory, mood and affect.  (R. at 242, 261, 342-43, 363, 416, 552, 578-79, 581-82, 736.)  Plaintiff also appeared alert, oriented and in no acute distress on multiple occasions.  (R. at 245, 363, 415, 420, 424, 552, 555-56, 573, 578-79, 581-82, 616, 619, 628, 646, 832, 849.)  And Plaintiff's treating physicians further opined that Plaintiff had normal sensation, strength and quality of movement. (R. at 269, 291, 316, 333, 343, 415-16, 420, 487, 556, 573, 581-82, 827, 832-33, 845, 849.) Plaintiff's psychiatrist, Syed M. Ahmed, M.D., recorded that Plaintiff appeared well and stable following medicative treatment.  (R. at 662, 665, 668, 674, 677, 683, 686, 689, 698, 701, 926, 936, 946, 951, 956, 972.)  And, in physical and occupational therapy, Plaintiff exhibited the ability to perform activities of daily living independently, though she required breaks after standing too long.  (R. at 302, 316, 333.)

These descriptions of Plaintiff — some provided by Drs. Awadh and Cashdollar — contradict the restrictive limitations endorsed in the doctors' opinions. Indeed, Plaintiff's longitudinal treatment record is consistent with the less restrictive findings that the ALJ described in her RFC, permitting Plaintiff to perform at least sedentary work. Substantial evidence in Plaintiff's treatment record therefore supports the ALJ's assignment of limited weight to Drs. Awadh's and Cashdollar's opinions.

### 4.    Plaintiff's Testimony Further Undermines the Doctors' Opinions.

Finally, as the ALJ correctly observed, Plaintiff's own subjective testimony contradicts the severe limitations endorsed by Drs. Awadh and Cashdollar. At Plaintiff's hearing on December 8, 2016, Plaintiff testified that she typically woke up early to care for her two children. (R. at 1017-18.) Plaintiff further testified that she could cook breakfast for herself. (R. at 1018.) She could also keep track of and take her medications, which included at least fourteen separate prescriptions. (R. at 1018-23.) And Plaintiff stated that she occasionally drove, including driving herself for over an hour to the hearing. (R. at 1017.)

In Plaintiff's March 2014 function report, she affirmed that she took care of her two children, receiving help from her mother to cook, clean and help the children with homework. (R. at 202, 208.) Plaintiff attested that she could dress herself, feed herself and use the bathroom. (R. at 202.) Plaintiff could also bathe herself, though she used handicap equipment to make it easier. (R. at 202.) Plaintiff reaffirmed that she could keep track of her medications, though sometimes it proved difficult if she felt restless. (R. at 203.) To feed herself and her children, Plaintiff confirmed that she could prepare simple meals. (R. at 203.) Plaintiff also performed indoor chores, reporting that she wiped down surfaces, dusted and cleaned up after herself. (R. at 203.) Plaintiff stated that she could use a computer and manage her own finances. (R. at 204.)

For fun, Plaintiff noted that she read two to three books per month and watched television for two to three hours per day. (R. at 205.) Plaintiff also reported that she could read and follow written instructions, and she could follow spoken instructions if she sometimes wrote down notes. (R. at 206.) Plaintiff further described herself as getting along "very well" with others and adapting well to changes in a routine. (R. at 207.)

The ALJ opined that Plaintiff's statements provided part of the reasoning for affording Drs. Awadh's and Cashdollar's opinions limited weight. (R. at 27.) The record supports the ALJ's findings. Unlike the restrictive limitations that Drs. Awadh and Cashdollar endorsed, Plaintiff's hearing testimony and function report demonstrate Plaintiff's ability to perform at least sedentary work around her household and in public. Although Plaintiff's testimony does comport with many of her subjective complaints, her activities of daily living and admitted abilities do not support the very limited capacity described by Drs. Awadh and Cashdollar. Instead, Plaintiff's own statements, coupled with her treatment records, provide substantial evidence to support the ALJ's finding that Drs. Awadh's and Cashdollar's opinions deserved only limited weight.

Because substantial evidence supports the ALJ's assertion that Drs. Awadh's and Cashdollar's opinions proved inconsistent with the record, Plaintiff's contention that the ALJ "substituted a subjective decision for that of the overwhelming medical evidence" lacks merit. (Pl.'s Mem. at 11 (internal quotations and citations omitted).) The ALJ did not err.

**B.     The ALJ Did Not Commit Reversible Error at Step Five.**

Plaintiff contends that the ALJ erred by posing a hypothetical to the VE that did not account for all of Plaintiff's substantiated limitations. (Pl.'s Mem. at 11-13.) Specifically, Plaintiff alleges that the ALJ's hypothetical did not reflect Plaintiff's need to elevate her legs, use

18

a cane for balance or have a sit/stand option at work.  (Pl.'s Mem. at 12.)  Plaintiff further

maintains that the hypothetical did not reflect Plaintiff's "difficulty maintaining pace,

persistence, concentration and attendance due to her significant pain and fatigue."  (Pl.'s Mem. at

12.)  Defendant responds that substantial evidence supports the ALJ's RFC assessment, as well

as the corresponding hypothetical; thus, the ALJ did not err by failing to include the additional

limitations.  (Def.'s Mem. at 16-17.)

     1.     **The ALJ Properly Determined Plaintiff's RFC.**

     By challenging the hypothetical that the ALJ posed to the VE, Plaintiff necessarily

challenges the RFC.  Accordingly, the Court must first determine whether the ALJ's ultimate

RFC assessment accounted for all of Plaintiff's substantiated impairments.

     After step three of the analysis, but before deciding whether a claimant can perform past

relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R.

§§ 404.1520(e)-(f), 404.1545(a)(1), 416.920(e)-(f), 416.945(a)(1).  In analyzing a claimant's

abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental

limitations and then determine the claimant's RFC for work activity on a regular and continuing

basis.  §§ 404.1545(b), 416.945(b).  Generally, the claimant bears the responsibility to provide

the evidence that the ALJ utilizes in making his RFC determination; however, before making a

determination that a claimant is not disabled, the ALJ must develop the claimant's complete

medical history, including scheduling consultative examinations if necessary.  §§ 404.1545(a)(3),

416.945(a)(3).  The RFC must incorporate impairments supported by the objective medical

evidence in the record and those impairments that have basis in the claimant's credible

complaints.  §§ 404.1545(e), 416.945(e).  The ALJ must conduct a function-by-function analysis

in assessing a claimant's RFC, and remand may be appropriate in cases where the ALJ fails to

assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains inadequacies that frustrate meaningful review. *Mascio*, 780 F.3d at 635-36. The assessment must include a narrative discussion of how the evidence supports each conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations. SSR 96-8p.

In this case, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with some additional limitations. (R. at 22.) Specifically, the ALJ limited Plaintiff to only occasional balancing, stooping, kneeling, crouching or climbing ramps or stairs. (R. at 22.) The ALJ further stated that Plaintiff could never crawl or climb ladders, ropes or scaffolds. (R. at 22.) Neither could Plaintiff handle exposure to workplace and environmental hazards. (R. at 22.) Plaintiff could only frequently handle and finger bilaterally and required a cane to ambulate as needed. (R. at 22.) And the ALJ found that Plaintiff could lift and carry up to ten pounds and walk for a total of two hours and sit for a total of six hours in an eight-hour workday. (R. at 27.)

In making her RFC findings, the ALJ considered all of Plaintiff's subjective symptoms to the extent that they comported with evidence and medical opinions of record. (R. at 22.) In considering Plaintiff's subjective symptoms, the ALJ followed the two-step process required by the regulations. The regulations first require the ALJ to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the claimant's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3.[9] In so doing, the ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be

---

[9]      Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p. Plaintiff filed her claim on May 7, 2015, before this regulation took effect. (R. at 359, 365.) Because Agency cannot engage in retroactive rulemaking, SSR 96-7p applies to Plaintiff's claim.

based on *all* of the relevant evidence in the case record") (emphasis added). If the underlying impairment(s) reasonably could be expected to produce the claimant's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affected the claimant's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must consider "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

Ultimately, this Court must accept the ALJ's factual findings and credibility determinations unless the "'credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)). Further, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, Plaintiff testified that she experienced "swelling in both feet and ankles, causing pain, inflammation, and balance irregularities." (R. at 23, 1026-29.) She further attested that her eye problems prevented her from seeing at night, with no relief from glasses and only some relief from special contact lenses. (R. at 23, 1024-25.) Plaintiff complained of tingling in her hands, recurring headaches and back pain radiating from her neck down. (R. at 23, 1031-34.) She also

affirmed worsening endometriosis,[10] which at one point required emergency treatment. (R. at 23, 1034.) In addition, Plaintiff testified to experiencing suicidal ideations, crying spells and difficulty sleeping. (R. at 23, 1039-40.)

Plaintiff alleged multiple functional impairments resulting from her symptoms. Plaintiff testified that she could sit for no longer than ten to fifteen minutes. (R. at 23, 1037.) She further testified that she could stand for only ten minutes, lift less than five pounds and walk half a city block. (R. at 23, 1037-38.) Plaintiff stated that she had to crawl to ascend stairs and could not easily rise from a seated position. (R. at 23, 1039.) And she had trouble reaching overhead. (R. at 23, 1039.) To assist her balance, Plaintiff affirmed that she required a four-pronged cane seventy-five percent of the time. (R. at 23, 1027-28.) Plaintiff also alleged that her hand tingling made it difficult for her to use zippers, buttons and cell phones. (R. at 23, 1031-32.)

After detailing Plaintiff's testimony, the ALJ found, in accordance with step one, that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, at step two, the ALJ determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms did not entirely comport with the medical evidence and other evidence of record, going on to explain why. (R. at 23-27.) Substantial evidence supports the ALJ's findings.

As the ALJ discussed in her opinion, Plaintiff's treatment records do not support all of her alleged impairments. Although Plaintiff claimed that she could not sit for more than ten to fifteen minutes or stand for more than ten minutes, her longitudinal treatment record notes repeatedly that Plaintiff had a normal gait and range of motion. (R. at 242, 261, 342-43, 363,

---

[10]     Patients with endometriosis experience tissue growth on the outside of the uterine cavity, causing pain. *Endometriosis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

416, 552, 578-79, 581-82, 736.)  Plaintiff's treating physicians further opined that Plaintiff had

normal sensation, strength, and quality of movement.  (R. at 269, 291, 316, 333, 343, 415-16,

420, 487, 556, 573, 581-82, 827, 832-33, 845, 849.)  And in physical and occupational therapy,

Plaintiff exhibited the ability to perform activities of daily living independently, though she

required breaks after standing too long.  (R. at 302, 316, 333.)  With respect to Plaintiff's ability

to maintain concentration, persistence, pace and attendance, the record is replete with evidence

of her normal memory, concentration, speech, orientation, mood and affect.  (R. at 242, 261,

342-43, 363, 416, 552, 578-79, 581-82, 736.)  These treatment records support the ALJ's

findings that Plaintiff could perform sedentary work with additional limitations.

Plaintiff also responded well to conservative treatments, which the ALJ found

inconsistent with Plaintiff's alleged impairments.  (R. at 25.)  Plaintiff's podiatrists treated her

feet with medications, supportive footwear, stretches and night splints, which improved

Plaintiff's condition.  (R. at 615-16, 622-23, 625, 636, 645, 648, 737-39, 743-45, 774, 777-78,

781-84, 786-87, 789-90.)  Plaintiff's neurologists treated her neuropathy with Lyrica and

outpatient occupational and physical therapy.  (R. at 302-05, 316-17, 332-33, 550-52.)  Likewise,

Plaintiff's orthopedic physicians instructed her to attend outpatient physical therapy and take

medications to treat her back pain, which Plaintiff found helpful.  (R. at 823, 828-29, 833, 840-

43, 849-50.)  Plaintiff's back pain also responded well to epidural steroid injections.  (R. at 813,

851-52.)  Plaintiff herself admitted that insulin and non-insulin medications helped control her

diabetes, with some adjustments as needed.  (R. at 1022.)  As for her endometriosis, Plaintiff's

longitudinal record shows that continued use of medicative treatment successfully stabilized her

condition.  (R. at 241, 254, 268, 404, 417-18, 421-22, 564-65.)  And Plaintiff's psychiatrist

described her as stable after she took her prescribed medications.  (R. at 662, 665, 668, 674, 677,

683, 686, 689, 698, 701, 926, 936, 946, 951, 956, 972.)  When Plaintiff complained that a treatment did not work, her physicians did not respond with more drastic treatments but instead altered her existing, conservative course of care.  (R. at 580-82, 619-20, 680, 738-39, 816, 823, 828, 839, 891, 896, 967.)  The ALJ reasonably relied on the "conservative and outpatient nature of [Plaintiff's] treatment history" in concluding that Plaintiff's retained a greater functional capacity than she alleged.  (R. at 25-26); *Dunn*, 607 F. App'x at 274-75.

The ALJ further considered Plaintiff's own testimony, finding it inconsistent with Plaintiff's alleged impairments.  (R. at 25-26.)  As mentioned, Plaintiff testified to caring for her children, with help from her mother.  (R. at 202, 208, 1017-18.)  Plaintiff affirmed that she could cook at least simple meals, clean the house and help her children with homework.  (R. at 202-03, 1018.)  Plaintiff managed multiple medications by herself and could both dress and bathe herself.  (R. at 203, 1018-23.)  Plaintiff also noted that she could use a computer, read, follow written and spoken instructions, and get along "very well" with others.  (R. at 207.)  This testimony proves inconsistent with Plaintiff's alleged exertional and non-exertional limitations and supports the ALJ's RFC findings.

Although Plaintiff asserts that ALJ should have included a sit/stand option, leg elevation and cane-use requirements in the RFC, her treatment records and reported activities suggest that she maintained a greater range of motion and ability to ambulate than alleged.  Moreover, the ALJ *did* include in the RFC that Plaintiff "must be allowed to use a cane to ambulate as needed," agreeing with evidence that Plaintiff suffered from neuropathy and podiatric pain that inhibited her ability to walk.  (R. at 22.)  Plaintiff further contends that the ALJ should have accounted for Plaintiff's difficulty maintaining concentration, persistence, pace and attendance due to pain and fatigue.  However, the evidence of record reveals relatively manageable conditions that, although

24

serious, did not inhibit Plaintiff's concentration or her ability to work with others and complete simple tasks. Indeed, at step two, the ALJ found that Plaintiff only suffered a mild limitation in the functional area of maintaining concentration, persistence and pace. (R. at 20.) In support of this finding, the ALJ cited Plaintiff's ability to get her children ready for school, take care of personal needs, complete light chores around the house, drive, grocery shop, use a computer and perform other activities. (R. at 20.) Finally, treatment records show that Plaintiff repeatedly demonstrated normal memory, concentration, speech orientation, mood and affect; and, her psychiatric symptoms responded well to conservative treatment, which the ALJ noted in the RFC assessment. (R. at 24-25.)

Ultimately, the ALJ's RFC findings comport with the evidence of record and accounted for all of Plaintiff's substantiated limitations. Because the ALJ explained her reasoning for not fully crediting all of the limitations that Plaintiff alleged, and because substantial evidence supports the RFC, the ALJ did not err by failing to include additional limitations in the RFC.

### 2.   The ALJ Did Not Pose a Hypothetical that Exactly Corresponded to the RFC.

Because substantial supports the RFC, the Court will deem the hypothetical posed to the VE proper, so long as it accurately captured all of the limitations included in the RFC. At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant could perform other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 404.1566, 416.920(g), 416.966. The Commissioner can carry her burden in the last step with the testimony of a VE. §§ 404.1566(e), 416.966(e). During an administrative hearing, the ALJ must pose hypothetical questions to the VE that accurately represent the claimant's RFC, so that the VE can offer testimony about any jobs existing in the national economy that the claimant could perform.

25

*Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

However, courts in the Fourth Circuit have repeatedly held that the hypotheticals posed to a VE need not be a literal recitation of a claimant's RFC. *See, e.g.*, *Russell v. Barnhart*, 58 F. App'x 25, 30-31 (4th Cir. 2003) (finding that the ALJ adequately captured the plaintiff's diminished intellectual capacity by including limitations in the hypothetical about the plaintiff's ability to maintain attention); *Yoho v. Comm'r of Soc. Sec.*, 1998 WL 911719, at *3 (4th Cir. Dec. 31, 1998) ("There is no obligation, however, to transfer the findings on the PRTF verbatim to the hypothetical questions."); *Jones v. Astrue*, 2010 WL 4923294, at *11 (D. Md. Nov. 29, 2010) (holding that it was "not fatal" for the ALJ to describe the plaintiff's limitations instead of using exact terminology). Thus, a hypothetical is appropriate if it adequately reflects the limitations supported by the record, even though it may not precisely capture a claimant's RFC. *Powell v. Astrue*, 2013 WL 3776948, at *7 (D. Md. July 7, 2013). Further, if an ALJ fails to account for a limitation in his or her hypothetical to a VE, a court will not recommend remand if the omission would not change the substance of the decision. *Morgan v. Barnhart*, 142 F. App'x 716, 723 (4th Cir. 2005). Accordingly, if the jobs listed by the VE in response to a hypothetical ultimately account for the omitted limitation(s), the Court will affirm the ALJ's step-five determination. *See McClellan v. Comm'r*, 2013 WL 1703879, at *4 (D. Md. Apr. 18, 2013) (finding that the ALJ committed harmless error when omitting the plaintiff's climbing limitations from his hypotheticals because the jobs listed by the VE did not require climbing).

During Plaintiff's hearing, the ALJ posed several hypotheticals to the VE. (R. at 1046-48.) In her first hypothetical, the ALJ asked the VE to imagine a person of Plaintiff's age,

26

education and work experience, with the RFC to perform sedentary work. (R. at 1046.) The ALJ further asked the VE to assume that the hypothetical individual could only occasionally balance, stoop, kneel, crouch or crawl, occasionally climb ramps or stairs, and never climb ladders, ropes or scaffolds. (R. at 1046.) The individual could never be exposed to hazards. (R. at 1046.) The hypothetical individual also had the capacity to frequently handle and finger bilaterally, required a cane to ambulate as needed and could understand, remember and carry out unskilled, simple, repetitive and routine tasks not at a production-rate pace. (R. at 1046.) The ALJ asked the VE if such a person could perform the claimant's past work, to which the VE responded no. (R. at 1046.) However, the VE affirmed that such an individual could perform a limited range of unskilled sedentary jobs, such as addresser, nut sorter and cuff folder. (R. at 1046-47.)

The ALJ posed three more hypotheticals to the VE, adding limitations related to leg elevation, being off task fifteen percent of the time and missing work, arriving late or leaving work early two days per month. (R. at 1047-48.) The ALJ responded that no jobs existed in the national economy for those hypothetical individuals. (R. at 1047-48.)

The ALJ relied on the VE's testimony for the first hypothetical to conclude that Plaintiff did not qualify as disabled, because she could perform other work existing in the national economy, including work as an addresser, nut sorter and cuff folder. (R. at 27-28.) But the first hypothetical did not precisely recount the limitations listed in the RFC. Specifically, the hypothetical described an individual who could *occasionally* crawl, while the RFC stated that Plaintiff could *never* crawl. (R. at 22, 1046.) Nor did the hypothetical account for Plaintiff's capacity to occasionally lift and carry no more than ten pounds of weight, to walk for no more than two hours and to sit for no more than six hours in an eight-hour workday. (R. at 27, 1046.)

27

This Court must therefore recommend remand unless these omissions are either adequately described in the phrasing of the hypothetical or otherwise constitute harmless error.

### a. The ALJ's Failure to Pose a Hypothetical to the VE that Verbatim Matched the RFC Constitutes Harmless Error.

When confronted with an error committed by the ALJ, the Court must determine whether to apply the harmless error doctrine. *See Mascio*, 780 F.3d at 639 (analyzing whether the ALJ's error in the credibility assessment constituted only harmless error); *Sharp v. Colvin*, 660 F. App'x 251, 252 (4th Cir. 2016) (deeming the ALJ's errors harmless). The burden of establishing a harmful error rests on "the party attacking the agency's determination." *Shineski v. Sanders*, 556 U.S. 396, 409 (2009). In determining the significance of an error, courts must consider, among other factors, "an estimation of the likelihood that the result would have been different . . . ." *Id.* at 411. Further, "where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency 'can decide whether re-consideration is necessary.'" *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011).

Against this standard, the Court concludes that the ALJ's misstatement of Plaintiff's capacity to crawl constitutes harmless error. The jobs of addresser, nut sorter, and cuff folder that the VE listed in response to the ALJ's first hypothetical do not require crawling. *See* 1991 WL 671797, 674226, 678284 (recording crawling as an activity or condition that "does not exist" in each position). Therefore, the ALJ could rely on the jobs that the VE listed to reach her step-five determination despite her failure to recount Plaintiff's capacity to never crawl.

The ALJ's failure to account for Plaintiff's capacity to lift only ten pounds likewise does not require remand, because the ALJ told the VE to assume that the hypothetical individual could perform only sedentary work. (R. at 1046.) The regulations define sedentary work to restrict lifting to ten pounds. 20 C.F.R. §§ 404.1567(a), 416.967(a). The law does not require a precise

recitation of Plaintiff's RFC, and the Court can safely assume that the VE, as an expert on vocational matters, understood what sedentary work permitted. *See Wilson v. Astrue*, 2013 WL 709824, at *3 (D. Md. Feb. 26, 2013) (noting that a "VE is highly-experienced and well trained in these assessments" and can understand what specific limitations are meant by "sedentary work"). Therefore, the ALJ did not err in failing to recount Plaintiff's specific lifting limitations.

Likewise, although the ALJ failed to explain that her hypothetical individual could walk for only two hours and sit for only six hours in an eight-hour workday, the omission did not constitute reversible error, as the regulations define sedentary work to include walking or standing for only brief periods. §§ 404.1567(a), 404.967(a). The jobs that the VE listed in his response to the first hypothetical each fall into the sedentary category. 1991 WL 671797, 674226, 678284. Therefore, the ALJ's phrasing in her first hypothetical properly recounted Plaintiff's postural limitations and, in any case, the VE's response captured those limitations, rendering the ALJ's imprecise recitation of the RFC harmless as error.[11]

Although the ALJ did not pose a hypothetical that included a verbatim account of Plaintiff's RFC, the first hypothetical accounted for all of Plaintiff's limitations either in its phrasing or in the ultimate response elicited from the VE. The ALJ could therefore rely on the VE's responses to reach her step-five conclusion that Plaintiff had the capacity to perform jobs

---

[11]   The Court notes one final inconsistency between the first hypothetical and RFC: The ALJ included in the first hypothetical that the individual could understand, remember and carry out unskilled, simple, repetitive and routine tasks not at a production-rate pace. (R. at 1046.) The ALJ excluded this limitation from the ultimate RFC, but this does not affect the ALJ's step-five finding. (R. at 22.) Indeed, the ALJ explained that Plaintiff could perform the jobs of addresser, nut sorter and cuff folder "even if [she] was limited to understanding, remembering, and carrying out simple, routine, and repetitive tasks that do not require a production rate pace." (R. at 28.)

existing in significant numbers in the national economy. For those reasons, the undersigned finds that the ALJ did not commit reversible error at step five.

## V.     CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) and Motion to Remand (ECF No. 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Henry E. Hudson and all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                                        /s/

                                        David J. Novak
                                        United States Magistrate Judge

Richmond, Virginia
Date: January 3, 2019